UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN CUTCHER,

        Plaintiff,

v.

KMART CORP.,

        Defendant.

_____/

Case No. 2:08-cv-10060

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT** (docket no. 25)

Plaintiff Susan Cutcher brought this action under the Family and Medical Leave Act,
29 U.S.C. §§ 2601 *et seq.*, against her former employer, defendant Kmart Corporation
(hereinafter "Kmart"), after Kmart laid her off in January 2006, on the expiration of a
medical leave she had taken.  The layoff was part of a nationwide reduction in force that
Kmart was implementing during that time period, but Cutcher maintains that she was
selected because she had taken medical leave.  Kmart contends instead that Cutcher was
one of the lesser rated employees in her store because of poor customer service skills and
rudeness to co-employees, and Kmart has accordingly moved for summary judgment on
those grounds.  Because the Court concludes that the evidence cannot support Cutcher's
claim in the absence of unrealistic and unsupported inferences, it will grant summary
judgment in favor of Kmart.

**FACTS**

The relevant facts are straightforward and, except as noted, undisputed.  Cutcher was
a longtime Kmart employee who worked at the Kmart Supercenter in Port Huron, Michigan,
where she was an hourly employee with some limited supervisory responsibilities.  At the

relevant time period, Cutcher's immediate supervisor was Ms. Barbara Borrell.  Other persons in Cutcher's supervisory chain were Linda Moore, a store co-manager (or "co-coach," as Kmart designated her), and Keith Zimmerman, the store manager (or "coach").  There does not appear to have been any friction between Cutcher and her supervisors.

Each year, the Port Huron store's management completed a performance appraisal (hereinafter "performance appraisal" or "appraisal") for Cutcher and the other hourly employees at the store.  In the several years preceding her dismissal, Cutcher's appraisals were generally positive.  On her 2002 year-end performance appraisal, Borrell assigned her a score in the "exceptional" range.  Docket no. 27-3.  The appraisal also noted that "Susan provides excellent customer services.  She is courteous and interacts well. . . . She shows good judgment and can solve any customer problems."  *Id.*  In her 2003 appraisal, Borrell assigned her a score in the "exceptional" range, the highest range possible.  *Id.*  In several subareas of the "Customer Service" and "Teamwork" sections of the appraisal, Borrell was required to rank Cutcher's performance as either "satisfactory" or "needs improvement."  With regard to each, Borrell checked the "satisfactory" box.  *Id.*  This included areas such as "treats customers with dignity and respect," "always helpful," "builds and maintains relationships with customers," "appropriately prioritizes work tasks and customer needs," "treats all associates with respect," and "cooperative and flexible in other areas."  *Id.*  In the "comments" sections, Borrell noted that Cutcher "treats our customers well," was "friendly and knowledgeable," "works well in any area," and was "helpful where needed."  *Id.*

Cutcher's 2004 appraisal was less glowing.  Although her overall ranking was "exceeds expectations," Borrell's only comment on Cutcher's customer service was that "Susan is able to provide adequate customer care."  *Id.*  In the teamwork area, Borrell

2

marked "treats all associates with respect" as needing improvement.  In the comments, she noted that "[i]t takes longer to get to accept the newer associates."  *Id.*

The 2005 appraisal – completed less than two months before Cutcher's discharge, and only a few weeks before her medical leave commenced – apparently reflected similar concerns.  Again, Cutcher's overall ranking was "exceeds expectations."  *Id.*  In the comments on the customer service section, Borrell noted that "[e]veryone has stressful times, but Susan usually is able to provide good, friendly customer service."  Borrell nevertheless assigned her a perfect score of 4 in this area.  *Id.*  In the teamwork section, Borrell marked both "treats all associates with respect" and "willing to share knowledge and information" as needing improvement.  She commented that "Susan just needs to try and help train new hires.  Also, be supportive of all the part-times."  *Id.*  Cutcher received a score of 2 in this area.

In 2005, Cutcher's doctor recommended that she undergo a hysterectomy, as a result of the hypermenorrhea Cutcher had been suffering from.  Cutcher agreed to the surgery, which was to occur on December 5th, 2005, and which would require a five-week recuperation period during which she would be unable to work.  Accordingly, she completed and filed with Kmart a certification from her doctor that she would require leave, as is required for FMLA leave.  Shortly thereafter, Cutcher also put in, and was approved, for paid short-term disability leave.  Kmart's internal record keeping procedures distinguished between this kind of paid leave and unpaid FMLA leave, and although Cutcher had filled out the forms for both, her status appeared in the company records as short-term disability leave.

After she completed the paperwork, Cutcher discussed her leave with Barbara Borrell, who was supportive of the leave.  Cutcher dep., docket no. 34, pp. 103-104.  Cutcher did

not discuss the leave with Moore or Zimmerman, either before or after commencing the leave. Eventually word reached Zimmerman that Cutcher was on, or was going to be on, medical leave. Zimmerman aff., docket no. 25-25, at ¶ 4.

It appears that the surgery occurred as scheduled, and was successful. Shortly thereafter, Borrell called Cutcher to check up on her; Cutcher had no other contact with management until shortly before her scheduled return to work. At her final post-operative checkup on January 17th, Cutcher told her doctor that she would prefer to wait an additional week before returning to work, and her leave was extended accordingly. Her first day back at work was thus scheduled to be January 23rd, 2006.

In late December 2005, however, (during the time that Cutcher was on leave) Kmart notified its store managers that it would be implementing a nationwide reduction in force, whereby several thousand full-time employees would be laid off. Kmart had determined the number of full-time associates that would be permitted at each store; stores that had more than this number would be required to reduce their staffing in order to comply. The reduction in force documents directed store management to determine which associates would be discharged by completing an "Associate Performance Recap Form" that included performance categories and scoring scales identical to those used in the performance appraisals. Each store employee was to be assigned score, from one through four, for each of the four "performance indicators" of customer service, teamwork, demonstrated work habits, and "effectiveness in position." In calculating an employee's overall recap score, however, store management was directed to average the individual scores, rather than total them as they had done for performance appraisals.

4

Store management was directed to lay off the employees who earned the lowest combined ranking in all four categories, until they reduced their workforce to the approved number.  In underscored text, the documents provided that

> [employees] on a leave of absence . . . are to be included in the selection process, but the fact of their LOA . . . is not to be considered as a rating factor. . . . . **Note:** Assocate's [sic] who are on a LOA status and are to be terminated due to their position in the rankings should not be terminated until returning to active status."

Docket no. 25-13.

The Performance Recap form itself directed store management to compare the scores they assigned their employees to the scores assigned at the most recent yearly performance appraisal, which in Cutcher's case at least had been completed only a month or so before.  The form provided a matrix for converting yearly performance appraisal scores to the scoring scale used in the Recap, and directed that "[i]f there is a significant change in score, be sure to document in the comment section and/or attached documentation as to why there is a difference . . . .  A reduced score in two or more categories without documented explanation in unacceptable."  Docket no. 33.

The Port Huron store was permitted 45 full-time associates, but at the time employed 51, six more than it was permitted.[1]  Zimmerman and the rest of the management team

---

[1]  Cutcher notes that if a store happened to have *fewer* full-time associates than its allocated number, it was directed to hire more employees until it met that number.  She further points out that  Kmart had identified the Port Huron store as having "special needs" requiring more employees than other stores of similar size.  She argues that, taken together, these two facts demonstrate that the Port Huron store should have been *hiring* full-time employees pursuant to the reduction-in-force program, not laying off existing employees.  The Court finds this interpretation of the evidence to be speculative and not credible.  While the reduction-in-force documents in the record do not provide enough information to calculate how many employees the Port Huron store was permitted – because they do not clarify how many extra workers its "special needs" required – the uncontradicted record evidence is that the Port Huron store indeed had six excess employees.  Furthermore, Cutcher does not dispute that six full-time employees were in fact laid off by the Port Huron store management, at least ostensibly pursuant to the

were thus required to complete the Recap rankings for each of their associates to determine which would be laid off.  With respect to Cutcher and the other employees in Cutcher's department, Zimmerman met with Moore and Borrell to complete these rankings. Because Borrell was Cutcher's immediate supervisor, Zimmerman permitted her to do most of the actual evaluation of Cutcher's performance.  Borrell dep., docket no. 35, p. 32; Moore dep., docket no. 36, pp. 19-20.

Cutcher's final ranking in the Performance Recap (hereinafter her "recap score") was not good.  She was scored two out of four for customer service, one of four for teamwork, four of four for demonstrated work habits, and three of four for effectiveness in position. This placed her overall score at 47th out of the 51 employees – and thus left Cutcher among the bottom six who were to be discharged.  Cutcher's overall score on the forms adduced in evidence is illegible, but there appears to be no dispute that the score was 2.6. Cutcher's converted overall score from her last yearly performance appraisal (hereinafter her "converted appraisal score") would have been a three (conversions were to whole numbers only; thus the converted scores did not include decimal places).  Seven other employees had converted appraisal scores of two; 32 had converted appraisal scores of three.[2]  In the "Notes" section of Cutcher's column of the Recap form was typed:

TERM     Poor customer and associate relations.  LOA

---

reduction-in-force program.  Cutcher dep., docket no 34, p. 55.  Without any evidence to corroborate Cutcher's theory, no reasonable jury could conclude that the Port Huron store management was willing to flout instructions from Kmart headquarters and subject their store to an unnecessary net loss of seven or more workers – approximately 15% of the full-time workforce – all to create cover for firing Cutcher for taking a six-week leave.  Thus, the only finding supported by the record is that the layoffs at the Port Huron store were indeed necessitated by Kmart's nationwide reduction in force.

[2]  No employee had a converted score lower than two.

Pursuant to the reduction in force guidelines, the Port Huron management completed an "Associates Impacted due to Rankings" form, listing each of the employees who was to be discharged. Cutcher was included on this form, with her termination date given as "TBD." In the "comments" area was noted "TBD – on LOA at present time, will term when she returns."

That was precisely what happened. When Cutcher reported for work on the morning of January 23rd, she was informed by Moore and Zimmerman that her employment was being terminated. Neither of them ever mentioned her leave of absence in connection with the layoff, in either speech or writing. Neither did Borrell.

## ANALYSIS

Cutcher claims that Kmart's termination of her employment violated her rights under the FMLA. Kmart has moved for summary judgment, claiming that this record does not support a finding that it has violated the FMLA.

I.  Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as to a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th Cir.1992).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). The Court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435-36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."

*Anderson*, 477 U.S. at 249-50 (citations omitted); *see Celotex*, 477 U.S. at 322-23; *Matsushita*, 475 U.S. at 586-87.

Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1995).

II. FMLA Actions

"The FMLA entitles qualifying employees to take up to twelve weeks of unpaid leave for, inter alia, "a serious health condition," 29 U.S.C. § 2612(a)(1)(D), and to be reinstated to their old position or an equivalent one on return from such leave, *id.* § 2614. The Sixth Circuit recognizes two theories of recovery available under the FMLA – an employee who takes FMLA leave may recover from his or her employer if it (1) denies the employee his or her FMLA rights or (2) retaliates against the employee for exercising those rights. *Wysong v. Dow Chem. Co.*, 503 F. 3d 441, 446 (6th Cir. 2007). Here, Cutcher claims that Kmart both interfered with her FMLA rights by denying her the reinstatement required by the statute, and retaliated against her by terminating her employment after she took FMLA leave. Because each of her theories of recovery relies on substantially the same evidence, the Court will first consider the theories separately insofar as necessary, and then explain why the evidence does not support either of them.

A. Was Cutcher on FMLA Leave?

As an initial matter, Kmart briefly disputes whether Cutcher was on FMLA leave at all. If she did not take FMLA leave, she is not protected by the statute. Kmart bases its

contention on the fact that although Cutcher filled out FMLA leave forms, she also applied for and was granted paid short-term disability leave.  Kmart asserts that because she was on paid short-term leave, she could not have been on FMLA leave as well.

Cutcher responds, and the Court agrees, that this is an incorrect statement of the law. The FMLA provides that, if an employer offers paid leave to its employees, an employee may elect to "substitute" this leave for part or all of the 12 weeks of leave guaranteed by the FMLA.  29 U.S.C. § 2612 (d)(2)(B).  Although the Sixth Circuit has not explicitly ruled on the question, the clear import of such an election is that the employer-provided paid leave and the FMLA leave run concurrently.  *See Chubb v. City of Omaha, Neb.*, 424 F. 3d 831, 831 (8th Cir. 2005); *Strickland v. Water Works & Sewer Bd.*, 239 F. 3d 1199, 1205 (11th Cir. 2001).  Thus, in obtaining approval for both FMLA leave and short-term disability leave, Cutcher was electing to have the two run concurrently, with the result that she was entitled to FMLA protections during the period of her convalescence.

B.  Interference Claim

Cutcher's first theory of recovery is that Kmart unlawfully interfered with her FMLA right to reinstatement after her medical leave.  The "interference theory" of recovery under the FMLA arises from paragraph (1) of 29 U.S.C. § 2615(a), which makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." To establish an FMLA interference claim, a plaintiff must demonstrate that: (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled. *Killian v.*

10

*Yorozu Automotive Tenn., Inc.*, 454 F. 3d 549, 556 (6th Cir. 2006) (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir.2005)).

Here, there is no dispute that Cutcher has established the first three elements of the claim. Kmart disputes the fourth element, notice, but this is based solely on its purported distinction between FMLA leave and short-term disability leave, which the Court has already declined to accept. Thus, the only remaining point of contention is whether Kmart actually denied Cutcher her FMLA rights. Specifically, Kmart notes that because the FMLA does not entitle employees to "any right, benefit, or position of employment other than [those] to which the employee would have been entitled had the employee not taken the leave," 29 U.S.C. § 2614(a)(3)(B), an employer may avoid liability for denying reinstatement by proving that the "employee would not otherwise have been employed at the time reinstatement is requested," 29 C.F.R. § 825.216(a). Kmart points to the RIF as evidence that this is precisely what happened here: Cutcher's employment was terminated because the store had to cut personnel, and she was ranked lower than most of her colleagues.

For her part, Cutcher does not dispute that an RIF took place, or that her employment was terminated pursuant to it. She claims, however, that she was selected for layoff in the course of the RIF *because* she was on leave. As evidence of this, she points to the "LOA" notation in the "Comments" section of her Performance Evaluation Recap, as well as to the fact that her scores on her yearly evaluation, conducted just weeks before, were somewhat higher. Cutcher points out that there is testimony in the record that the "Comments" space on the recap was to include the reasons for an employee's low scores, Moore dep., docket no. 36, p. 20; Zimmerman dep., docket no. 37, p. 56, and argues that therefore the "LOA" notation indicates one of the reasons for her discharge. She further notes that if her converted performance appraisal score from a few weeks before -- which was a  3 -- had

11

been used as her recap score, she would not have been in the bottom six employees and thus would not have been discharged.  Since the only noteworthy event in her employment history between the performance appraisal and the performance recap was her FMLA leave, Cutcher concludes that her score was lowered to a dischargeable level in response to her taking the leave.

The Court, however, does not regard either of these pieces of evidence, or both of them taken in conjunction, as creating a genuine issue of fact as to whether Cutcher would have kept her job had she not taken FMLA leave.  The record does indicate that the reasons for an employee's low recap scores were to be entered in the "comments" space on the Recap form.  There is, however, no evidence at all that other material was *not* to appear in this space.  Indeed, the reduction-in-force guidelines indicated prominently that an employee's leave of absence was *not* a valid reason for lowering his or her Recap scores.  Instead, by providing that employees on leave should not be laid off until they returned, the guidelines made leaves of absence relevant to the reduction of force in a different, entirely proper, way.

Thus, the interpretation of the evidence offered by Kmart – that Cutcher's leave was noted on the Recap form to ensure that she would be retained as an employee until she returned, pursuant to corporate policy – is consistent both with the documentary evidence of how Kmart expected its store management to operate, and with what Zimmerman and Moore actually did.  By contrast, Cutcher's proposed inference on the issue would require a jury to find that the Port Huron store management knowingly violated both Kmart policy and the FMLA, and then created a written record of the violation for their corporate superiors to review, just to be able to terminate Cutcher due to the fact that she had taken FMLA leave. This argument requests too much of the Court. On the facts which are not in

12

dispute and viewing those that are in the light most favorable to the plaintiff, the Court concludes that any reasonable trial jury would be compelled to adopt Kmart's interpretation of the case.

Cutcher's claim of a discrepancy between her recap score and her converted performance appraisal score is then left for review.  As noted, Cutcher's converted score from her November 2005 performance appraisal was a 3, while her recap score was apparently in the 2.5 range.  While Cutcher is correct that employees with a recap score of 3 were not discharged, she fails to account for two additional crucial facts.  First, as noted above, the converted performance appraisal scores did not include decimal places.  Thus, Cutcher's converted score of "3" would in reality represent a recap score of anywhere between 2.5 and 3.4.  Her actual score of 2.6 -- which admittedly was in the bottom six employees -- was within this range.  As a result, there is little or no genuine discrepancy between Cutcher's performance evaluation score and her recap score.  In addition, the areas in which Cutcher received poor Recap scores -- customer service and teamwork -- were areas in which her poor performance had also been noted on her two previous performance evaluations.  Thus, there is also no qualitative discrepancy between the evaluations and the recap.

Cutcher nevertheless stresses that her scores in the specific areas of customer service and teamwork dropped inexplicably between the November 2005 appraisal and the December Recap; from 4 to 2 and 2 to 1, respectively.  But this drop only serves to underline the importance of the second fact she omits, namely, that a comparison of other employees' recap scores with their converted performance appraisal scores reveals that many of Cutcher's colleagues saw significantly greater variations between the two than she did.  In fact, one of the employees who ranked *below* Cutcher in the recap (and thus was

also discharged) also had a converted performance appraisal score of 3, and an unconverted appraisal score that was higher than Cutcher's . Numerous other employees had recap scores half a point, eight-tenths of a point, or even more above or below their converted performance-appraisal scores. Docket no. 32. Thus, although three employees who ranked below Cutcher in the most recent performance appraisal surpassed her in the recap rankings, something similar happened to many Kmart employees. Indeed, Cutcher herself passed up one of her colleagues between the appraisal and the recap.

Read as a whole, then, the evidence does not suggest that the Port Huron store management rigged the Performance Recap rankings in order to eliminate Cutcher from employment due to her taking FMLA leave. Instead, the evidence indicates that in evaluating their employees to determine who would be discharged and who would be retained, the management team found it necessary to adhere to a higher standard of care and accuracy in its grading than they perhaps used in their yearly performance appraisals.[3] The relatively minor discrepancies between Cutcher's appraisal score and her recap score, along with the larger discrepancies between these two scores for other employees, appear to be attributable to this factor, and not to Cutcher's FMLA leave.[4]

---

[3] Apparently Kmart's corporate decision makers agreed with this assessment, or else they could have instructed local management to make layoff decisions by reference to the most recent performance appraisals, which would have both saved considerable effort (because the appraisals were already complete) and perhaps protected Kmart from charges of singling out employees for discharge (because the appraisals had been completed before store management knew the reduction in force was to take place).

[4] Even if there were no apparent explanation for the differences between various employees' performance appraisal and recap scores, the record also reveals no basis for concluding that Cutcher's scores would not have decreased had she not taken leave. (The Court has already found the "LOA" notation to be insufficient evidence for proving this point). Therefore, even without the foregoing analysis the Court would still conclude that Kmart had carried its burden of proof on the issue.

2:08-cv-10060-SJM-VMM   Doc # 41   Filed 01/06/09   Pg 15 of 21   Pg ID 625

As a result of all this, the Court concludes that Kmart has carried its burden of demonstrating that Cutcher's employment would have been terminated even if she had not gone on leave. On this evidence, any reasonable jury would be compelled to conclude that Cutcher's employment was terminated pursuant to Kmart's reduction in force, and that her leave of absence was not counted against her in evaluating her performance for those purposes. Thus, the record does not permit a finding that Kmart denied her any FMLA rights, and summary judgment in favor of Kmart is therefore appropriate on Cutcher's interference claim.

C. Retaliation Claim

The "retaliation theory" of FMLA liability arises from paragraph (2) of 29 U.S.C. § 2615(a), which forbids "any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." An FMLA retaliation claim may be made either through direct or circumstantial evidence. Here, Cutcher claims to have direct evidence of retaliation, but argues that even if she does not, she has made out a claim by way of circumstantial evidence.

1. Direct Evidence

> [D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.

*DiCarlo v. Potter*, 358 F. 3d 408, 415 (6th Cir. 2004) (alteration in original; internal quotation marks omitted) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999), and *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003)); *see also Beery v. Associated Hygienic Prods., LLC*, 243 F. App'x 129, 132 (6th Cir. 2007) (quoting *Rowan v. Lockheed Martin Energy. Sys., Inc.*, 360 F. 3d 544, 548 (6th

15

Cir. 2004). A plaintiff's submission of such evidence obviously precludes a grant of summary judgment for the defendant.

Cutcher claims that the "LOA" notation is direct evidence of retaliation. As explained above, however, the Court regards this evidence as requiring a large and unsupported inferential leap to conclude that the notation was inserted as an explanation for Cutcher's low scores, rather than as a reminder not to terminate her employment till she returned from leave before it can be read to support Cutcher's claims. Thus, Cutcher has presented no direct evidence of retaliation.

B. Circumstantial Evidence

A plaintiff pursuing a claim under FMLA may alternatively state a claim for retaliation through circumstantial evidence,[5] using the presumption-based method of proof articulated by the Supreme Court in *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973). *See Killian*, 454 F.3d at 553-54. This type of claim requires a plaintiff to establish that (1) he or she was engaged in an activity protected by the FMLA; (2) the employer knew of that engagement and (3) after learning about it, took an adverse employment action which (4) was causally connected to the protected activity. *Killian*, 454 F.3d at 554.

Once the plaintiff has established this prima facie case, the burden of production – but not of persuasion – shifts to the employer to articulate a legitimate, non-discriminatory reason for the action. *Id*; *Taylor v. Union Institute*, 30 Fed. App'x 443, 448 (6th Cir. 2002).

─────────────

[5] Cutcher makes a short argument that the employer bears the burden in retaliation-theory FMLA cases of proving that there was no connection between a termination and FMLA leave, and so the circumstantial-evidence analysis need not apply. This argument is not correct and may represent momentary confusion between the interference theory of recovery (where this issue is a sort of affirmative defense, on which the employer does bear the burden of proof) and the retaliation theory (where this issue is actually an element of the plaintiff's case). The lone case she cites, *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F. 3d 955 (10th Cir. 2002), expressly dealt with the interference (also known as the "entitlement") theory. *Id.* at 962.

If the employer articulates such a reason, the employee must demonstrate that the reason is pretextual.  "An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee."  *Asmo v. Keane, Inc.*, 471 F. 3d 588, 596 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F. 3d 799, 805-06 (6th Cir. 1998)).

    1.  *Prima facie* case

Here, Kmart claims that Cutcher has not made out the fourth element of her *prima facie* case, the existence of a causal connection between her leave and her layoff.  Kmart's principal argument in favor of this contention is essentially identical to its defense to Cutcher's interference claim, discussed above: that Cutcher admits she was fired pursuant to the nationwide reduction in force, and that there is no evidence that impermissible factors played a role in the decision to discharge her.[6]  The Court has already concluded that Cutcher's evidence is insufficient to defeat Kmart's defense in this regard on the interference claim.  The Sixth Circuit, however, has made clear that, unlike the burden of proof for defeating such a defense, "[t]he burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity."  *Dixon v. Gonzales*, 481 F. 3d 324, 333 (6th Cir. 2007).  Accordingly, Cutcher claims that the mere fact that her employment was terminated on the day she was to return

---

   [6]  Kmart also suggests that, if Cutcher has indeed made out a *prima facie* case, the reduction in force is a legitimate nondiscriminatory reason for her discharge.  The Court rejects this argument.  A finding that Cutcher had made out a *prima facie* case would necessarily include reading the evidence as suggesting that Kmart used its reduction in force as the vehicle for retaliating against her for taking FMLA leave.  This would negate any possibility that the reduction in force could have been nondiscriminatory with respect to Cutcher.

17

from her FMLA leave is sufficient to support a causal connection between the leave and the termination for purposes of a *prima facie* retaliation claim.

In the Sixth Circuit,

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality. . . . The reason for this distinction is simple: if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation. Thus, employers who retaliate swiftly and immediately upon learning of protected activity would ironically have a stronger defense than those who delay in taking adverse retaliatory action.

*Mickey v. Zeidler Tool & Die Co.*, 516 F. 3d 516, 525 (6th Cir. 2008) (citation omitted). Thus, although the *Mickey* court cautioned that there was only a "limited number" of such cases, *id.*, on occasion it is possible for a plaintiff to establish a *prima facie* causal connection by showing temporal proximity between an employer's learning of the plaintiff's taking FMLA leave and terminating the employee.

The present case, however, is not such a matter. The undisputed testimony in the case indicated that Moore was aware of Cutcher's leave well before it began, and that Zimmerman became aware of it at some time before the ranking session, which itself was weeks before Cutcher's discharge became final. This left ample time for other evidence of the Port Huron store management's retaliatory intent to manifest itself.[7]   Therefore,

---

[7] To be sure, Cutcher and other FMLA plaintiffs who were discharged immediately on the expiration of their leave would be less likely to have personal knowledge of such evidence, because they will necessarily have been absent from the workplace for much of the time period in which it could be generated. But there is no reason why such evidence cannot be unearthed by means of the same discovery techniques through which plaintiffs

Cutcher is left to make her *prima facie* case under another set of precedents, which permit her to do so by showing a looser temporal connection between her employer learning of the protected conduct and making an adverse employment decision, "coupled with other indicia of retaliatory conduct." *Randolph v. Ohio Dept. of Youth Servs.*, 453 F. 3d 724, 737 (6th Cir. 2006).

There can be no doubt that Cutcher has shown the required temporal connection. Only a few months, at most, passed between her putting in for FMLA leave and her layoff. There is, however, little additional evidence of retaliation in the record.  Cutcher herself testified that Borrell -- the only of her supervisors with whom she discussed the leave -- was supportive of Cutcher's leave, and even called to inquire after her following the surgery. The only other managers who participated in assigning Cutcher's Recap ranking were Moore and Zimmerman, and the record is devoid of any indication that either of them were opposed to or unhappy about Cutcher's leave in any way.

The only potential indicia of retaliatory conduct that Cutcher can point to, then, are the "LOA" notation next to her ranking on the Recap form, and the purported discrepancy between her performance appraisal ranking and her Recap ranking.  The Court has already examined these pieces of evidence, and found them not to be probative of any connection between Cutcher's leave and her layoff.  Accordingly, the Court finds that Cutcher has failed to establish a circumstantial *prima facie* case of retaliation.[8]

---

obtain every other kind of evidence of which they have no personal knowledge.

   [8] Kmart also claims that Cutcher has failed to establish a causal connection because she has not established that Zimmerman knew that her leave was FMLA leave.  Cutcher responds that Zimmerman knew she was on *some* kind of leave, and that is all that is necessary.  Although the Court's initial tendency is to agree with Cutcher, given that the evidence dictates judgment for Kmart on other grounds, no further investigation of this issue is warranted.

### 2. Nondiscriminatory Reason and Pretext

Kmart also points out that even if Cutcher has established a *prima facie* case under this inquiry, the reduction in force is a legitimate and nondiscriminatory reason for dismissal. The Court agrees that a nationwide round of layoffs is a nondiscriminatory reason even if the temporal proximity between management's learning of her leave and deciding to lay her off was alone sufficient to establish Cutcher's *prima facie* case, and that the evidence that Cutcher was laid off pursuant to such a reduction in force is extraordinarily strong. Furthermore, the only possible evidentiary grounding for a finding that the reduction in force was a pretext would be the "LOA" notation and the score discrepancies, which the Court has already addressed and found wanting. Accordingly, even if Cutcher had established a *prima facie* case of retaliation, the evidence is such that any reasonable jury would be compelled to find that the reduction in force was the real, nonpretextual and nondiscriminatory reason for her discharge.

## CONCLUSION AND ORDER

There is not enough evidence in the record to support any of Cutcher's theories of recovery. All the evidence suggests that the "LOA" notation in the Performance Recap was not intended to indicate the reasons for Cutcher's layoff. While her contention to the contrary is consistent with the evidence, it remains speculative and without substantial grounding in the record. Further, the discrepancies between Cutcher's then-recent performance appraisal score and her performance recap score were minimal, and at any rate were no larger -- and often smaller -- than the corresponding differences between other employees' scores in the two evaluations. Neither of these pieces of evidence is indicative of any connection between Cutcher's leave of absence and the termination of her employment.

20

With respect to Cutcher's interference theory of recovery, then, Kmart has carried its burden of proof such that no reasonable jury could fail to conclude that she would have been discharged pursuant to the reduction in force even if she had not taken a leave of absence.  With respect to her retaliation theory of recovery, Cutcher has failed to produce any direct evidence that her discharge was in retaliation for her exercise of her FMLA rights.  She has also failed to demonstrate through circumstantial evidence that there was any causal connection between the two.   Finally, even if she had shown a causal connection, Kmart has made such a strong showing of a nondiscriminatory reason for her discharge (and Cutcher's evidence of a pretext is so weak) that no reasonable jury could reach any conclusion other than that her discharge did not violate the FMLA.

**WHEREFORE**, it is hereby **ORDERED** that the defendant Kmart's motion for summary judgment is hereby **GRANTED**.  Judgment will be entered in favor of Kmart in this cause.


s/Stephen J. Murphy, III

STEPHEN J. MURPHY, III
UNITED STATES DISTRICT JUDGE

Dated: January 6, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 6, 2009, by electronic and/or ordinary mail.

Alissa Greer
Case Manager